United States Court of Appeals,

Eleventh Circuit.

No. 94-8638.

Jesse ETHREDGE, Plaintiff-Appellant,

v.

Robert HAIL, Deputy Base Commander of Robins Air Force Base, in
His Official Capacity as an Officer and Agent of the United States
Air Force, as Agency of the United States of America, Defendant-
Appellee.

June 29, 1995.

Appeal from the United States District Court for the Middle
District of Georgia. (No. 92-CV-187-2-MAC (DF)), Duross
Fitzpatrick, Chief Judge.

Before HATCHETT, Circuit Judge, HENDERSON, Senior Circuit Judge,
and YOUNG[*], Senior District Judge.

HATCHETT, Circuit Judge:

In this case, we affirm the district court's ruling that an
administrative order that bars from Robins Air Force Base "bumper
stickers or other similar paraphernalia" that "embarrass or
disparage" the President of the United States does not violate the
First Amendment.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant, Jesse Ethredge, has worked for the United States
Air Force as a civilian aircraft mechanic for over twenty-five
years. Ethredge drives to work on Robins Air Force Base ("RAFB" or
"the base") four to six times a week, and, until October 1991, used
his truck for transportation to and from the base.

The principal military organization at RAFB, the Warner Robins

---

[*]Honorable George C. Young, Senior U.S. District Judge for
the Middle District of Florida, sitting by designation.

Air Logistics Center, provides maintenance and repair services to combat and transport aircraft, and acquires and manages items essential to the Air Force's operations. Other organizations on the base provide combat support, including refueling and communications services. Because access to the base is highly restricted, the Air Force considers RAFB a "closed base."

In 1984, Ethredge affixed stickers to the rear window of his truck top to read "HELL WITH REAGAN." Ethredge displayed this message to protest the Reagan administration's policies concerning unions and the civil service retirement system. Ethredge kept this sign on his truck until the end of President Reagan's tenure. Although a RAFB employee complained about the sign, officials took no action to require Ethredge to remove it.

After President Bush assumed office, Ethredge changed the stickers on his truck to state "READ MY LIPS HELL WITH GEO BUSH" and "FORGIVE BUSH NOT EGYPT HE LIED." Ethredge displayed these messages to protest President Bush's agreement to raise taxes, despite a campaign pledge to the contrary, and the decision to forgive certain debts Egypt owed to the United States.

Military personnel filed complaints about this sign. In addition, Colonel Robert M. Hail, deputy base commander at the time, received anonymous telephone calls from persons stating that if they saw the sign again, they would break the windows of Ethredge's truck. In 1991, Major General Richard F. Gillis, the installation commander of RAFB, directed Colonel Hail to order Ethredge to remove the sign from his truck while on the base. On October 17, 1991, Ethredge received a written order from Colonel

Hail, which stated, in relevant part:

> 1. As Robins Air Force Base (AFB) is a military installation, bumper stickers or other similar paraphernalia which embarrass or disparage the Commander in Chief are inappropriate as they have a negative impact on the good order and discipline of the service members stationed at Robins AFB....

> 2. You are hereby ordered, while at Robins AFB, to remove all bumper stickers that contain disparaging or embarrassing comments about the Commander in Chief of the United States of America. You have 12 hours to accomplish this order. Failure to comply with this lawful order will result in administrative action.

Instead of removing the stickers, Ethredge drove another vehicle to work. He then instituted this lawsuit, alleging that the administrative order violates the First Amendment. Ethredge sought preliminary and permanent injunctions prohibiting enforcement of the order, and a declaratory judgment declaring it unconstitutional.

Following a hearing, the district court denied Ethredge's motion for a preliminary injunction, finding that he had not established a clear likelihood of success on the merits of his claim. *Ethredge v. Hail,* 795 F.Supp. 1152, 1159 (M.D.Ga.1992) (*Ethredge I*). Specifically, the court held that the order was viewpoint neutral and reasonable, and that Ethredge's sign constituted a clear danger to the discipline, loyalty, and morale of Air Force personnel on RAFB. *Ethredge I* at 1156-59. Ethredge took an interlocutory appeal of the district court's determination.

After Ethredge instituted that appeal, however, President Clinton commenced his term in office and this court concluded that the change in the office of President rendered Ethredge's appeal moot:

> [B]y its terms the motion for preliminary injunction seeks

> relief solely as to Ethredge's anti-Bush stickers. But former-President Bush is no longer in office. Consequently, the administrative order no longer forbids Ethredge's anti-Bush stickers. It does not appear that Ethredge is being precluded from displaying his anti-Bush stickers notwithstanding the order's inapplicability to them. Thus, no live controversy remains with respect to Ethredge's request for preliminary injunctive relief.

*Ethredge v. Hail,* 996 F.2d 1173, 1175 (11th Cir.1993) (*Ethredge II*). This court also determined that the issues raised in Ethredge's requests for a permanent injunction and declaratory judgment "may remain live notwithstanding President Bush's departure from the White House." *Ethredge II* at 1176. Thus, this court remanded the case to the district court. *Ethredge II* at 1177.

In April 1993, following oral argument in *Ethredge II* but before this court had rendered its decision, Ethredge removed the stickers stating "FORGIVE BUSH NOT EGYPT HE LIED" from the rear window of his truck and replaced them with stickers reading "HELL WITH CLINTON AND RUSSIAN AID." On August 24, 1993, RAFB's legal counsel informed Ethredge's lawyer that the October 17, 1991, order "would apply to the latest sign." Consequently, after remand, Ethredge amended his complaint to include his sign concerning President Clinton.

Following discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment for the appellee "[f]or [the] reasons stated" in *Ethredge I.* This appeal followed.

### CONTENTIONS

Ethredge contends that the administrative order barring signs that "embarrass or disparage" the President is not viewpoint neutral, but, rather, impermissibly favors the viewpoint of

supporters of the President. He also argues that military officials have no right to exclude his sign from RAFB because they have not demonstrated that the sign poses a clear and present danger to military loyalty, morale, or order. Finally, Ethredge asserts that the order prohibiting his sign is unreasonable and overly broad.

The government responds that the administrative order does not proscribe any sign because of the political view expressed; thus, the order is not unconstitutionally viewpoint-based. The government also argues that the order constitutes a reasonable exercise of the authority of military officials to exclude on-base speech that interferes with military effectiveness.

## DISCUSSION

We review the district court's ruling on the constitutionality of the RAFB administrative order under the *de novo* standard. *See Redner v. Dean,* 29 F.3d 1495, 1499 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995).

The extent to which the government can restrict speech "depends on the nature of the relevant forum." *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The Supreme Court has adopted a "forum analysis" for determining First Amendment claims involving governmental property. *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448. The Court's framework divides governmental property into three categories: traditional public forums, created public forums, and nonpublic forums. *See, e.g., Perry Educ. Assoc. v.*

*Perry Local Educators' Assoc.,* 460 U.S. 37, 45-46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). No question exists that RAFB constitutes a nonpublic forum. *See, e.g., United States v. Albertini,* 472 U.S. 675, 686, 105 S.Ct. 2897, 2905, 86 L.Ed.2d 536 (1985) ("Military bases generally are not public fora...."); *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976) ("The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is ... historically and constitutionally false."). "Once speech enters the realm of nonpublic forums the government's power over its regulation increases dramatically." *M.N.C. of Hinesville v. United States Dep't of Defense,* 791 F.2d 1466, 1474 (11th Cir.1986). Accordingly, military officials at RAFB may impose a regulation on speech so long as the restriction "is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955.[1]

Ethredge first argues that the administrative order impermissibly regulates the display of constitutionally protected speech based on the viewpoint of the speaker. Under the regulation, officials bar signs that "embarrass or disparage" the President, but permit signs that praise the President or embarrass

---

[1]Ethredge's status as a civilian worker on the base does not affect our analysis. A military commander's authority to bar persons or speech from a base extends to civilians. *See, e.g., Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 892-94, 81 S.Ct. 1743, 1747-48, 6 L.Ed.2d 1230 (1961); *Greer,* 424 U.S. at 838, 96 S.Ct. at 1217.

or disparage the President's political opponents. Therefore, Ethredge asserts, the order treats speakers differently depending upon whether they praise or attack the President. The officials grant supporters of the President free reign to support the President and disparage his opponents, while it mandates that political opponents of the President express criticism of the Commander in Chief in a sanitized (i.e., not embarrassing or disparaging) manner. *See R.A.V. v. City of St. Paul,* --- U.S. ----, ----, 112 S.Ct. 2538, 254, 120 L.Ed.2d 305 (1992) (the government "has no ... authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules").

Ethredge is correct in asserting that "[t]he prohibition against viewpoint discrimination is firmly embedded in first amendment analysis." *Searcey v. Harris,* 888 F.2d 1314, 1325 (11th Cir.1989). But, his contention that the order discriminates against speakers depending upon their viewpoint is incorrect. First, as Ethredge acknowledges, the order does not prohibit criticism of the President. Military officials at RAFB permit vehicles on the base that have bumper stickers clearly critical of the President.[2] Second, and even more fatal to Ethredge's claim, the order in no way limits the application of the restriction to opponents of the President. The order simply prohibits "bumper stickers or other paraphernalia which embarrass or disparage" the Commander in Chief. Thus, the order applies to supporters of the

---

[2]One such bumper sticker reads, "Bill Clinton has what it takes to take what you have." Another states, "Defeat Clinton in '96."

President as well. Indeed, we can imagine signs or messages that, although intended to be supportive of the President, may (due to a profane nature, for example) embarrass or disparage the President. Such signs would also be excluded from RAFB under the administrative order. Therefore, we reject Ethredge's assertion that the order treats speakers differently depending upon whether they express a view supporting or opposing the President.

Ethredge next argues, relying on *Priest v. Secretary of Navy,* 570 F.2d 1013, 1017 (D.C.Cir.1977), that military officials had to demonstrate that his sign "tended to interfere with responsiveness to command or to present a clear danger to military loyalty, discipline, or morale" before they could permissibly issue the administrative order.

Ethredge's reliance on *Priest* is misplaced. The court in *Priest* found that "[t]he government does not have the burden of showing a causal relationship between [the banned activity] and specific examples of weakened loyalty, discipline or morale...." *Priest,* 570 F.2d at 1018. In fact, *Priest* merely approved a military judge's instruction that required the court-martial to find that the defendant's publications "tended to interfere with responsiveness to command or to present a clear danger to military loyalty, discipline, or morale" in order to sustain his criminal conviction under the Uniform Code of Military Justice (UCMJ). *Priest,* 570 F.2d at 1017.

Contrary to Ethredge's assertion, military officials need not demonstrate actual harm before implementing a regulation restricting speech. *See Greer,* 424 U.S. at 840, 96 S.Ct. at 1218

("There is nothing in the Constitution that disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command."). *See also Cornelius,* 473 U.S. at 810, 105 S.Ct. at 3453 ("[T]he government need not wait until havoc is wreaked to restrict access to a nonpublic forum."). Thus, officials at RAFB had a right to promulgate the order in response to their evaluation that Ethredge's sign constituted a clear danger to military order and morale. The government submitted evidence that the installation commanders made such an evaluation.

Finally, Ethredge urges that the administrative order is unreasonable and overly broad. The reasonableness of a restriction on access to a nonpublic forum "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3453. Therefore, we must remain mindful that "[t]he military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman,* 475 U.S. at 507, 106 S.Ct. at 1313. Moreover, in assessing the reasonableness of the restriction, no requirement exists "that the restriction be narrowly tailored." *Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3452. In fact, the restriction "need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452. We reject Ethredge's contention that the administrative order is unreasonable. First, the order does not prohibit robust

criticism of the President; instead, it bars only those messages that "embarrass or disparage" the Commander in Chief. Second, under the UCMJ the military can impose discipline against its members for displaying similar signs. *See* 10 U.S.C. § 888 ("Any commissioned officer who uses contemptuous words against the President ... shall be punished as a court-martial may direct."); 10 U.S.C. § 889 (any military member "who behaves with disrespect toward his superior commissioned officer shall be punished as a court-martial may direct"). Finally, Major General Gillis and his successor as installation commander, Major General William P. Hallin, stated in affidavits that they believed that Ethredge's sign would undermine military order, discipline, and responsiveness.[3] We must give great deference to the judgment of these officials:

> [C]ourts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest. Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy.

*Goldman v. Weinberger,* 475 U.S. 503, 507-08, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (citations and internal quotations omitted). In short, military officials at RAFB had sufficient justification to enact the administrative order, and the order constitutes a

---

[3]We note that in making this determination, the installation commanders possessed evidence that Ethredge's sign had caused some disruption on the base. The record shows that service members complained about Ethredge's anti-Bush sign, finding it offensive and damaging to morale. Also, anonymous telephone callers contacted Colonel Hail and communicated that they intended to break the windows of Ethredge's truck.

reasonable exercise of their authority.[4]

Ethredge's argument that the order is overly broad fails under the principles expressed in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). In *Parker,* the Supreme Court rejected overbreadth and vagueness challenges to Article 133 of the UCMJ, 10 U.S.C. § 933, providing punishment for "conduct unbecoming an officer and a gentleman," and Article 134 of the UCMJ, 10 U.S.C. § 934, proscribing, among other things, "all disorders and neglects to the prejudice of good order and discipline in the armed forces." *Parker,* 417 U.S. at 757, 94 S.Ct. at 2562. The administrative order at issue here is no more vulnerable to an overbreadth challenge than were Articles 133 and 134. The challenged order calls for military authorities to make a judgment concerning whether particular signs "embarrass or disparge" the President, the head of the chain of command. As with Articles 133 and 134, "[t]here is a wide range of ... conduct ... to which [the challenged order] may be applied without infringement of the First Amendment." *Parker,* 417 U.S. at 760, 94 S.Ct. at 2564. Thus, the fact that "there may lurk at the fringes ... some possibility that conduct which would be ultimately held to be protected by the First Amendment could be included within [the order's] prohibition" is "insufficient to invalidate" the order. *Parker,* 417 U.S. at 760-61, 94 S.Ct. at 2564.

In sum, "[t]he military establishment is subject to the

_____

[4]The fact that officials took no action regarding Ethredge's "HELL WITH REAGAN" sign does not change our view. The evidence shows that the installation commander during that period had no knowledge of the existence of the sign.

control of the civilian commander in chief and the civilian departmental heads under him, and its function is to carry out the policies made by those civilian superiors." *Parker,* 417 U.S. at 751, 94 S.Ct. at 2559. We hold that the administrative order constitutes a reasonable exercise of the authority that military officials possess in determining how best to fulfill this function.

## CONCLUSION

We hold that the administrative order barring from RAFB "bumper stickers or other paraphernalia" which "embarrass or disparage" the President is viewpoint neutral and reasonable. Accordingly, the order does not violate the First Amendment. Therefore, we affirm the judgment of the district court.

AFFIRMED.